The court of Illinois has re-convened. You may be seated. This is our third case in the morning. In re of the estate of Dorsett. For the appellant, Mr. Rastak, and for the appellate, Mr. Baker, I may proceed. Good morning, your honors. Michael Rastak, again. This time on behalf of the plaintiff and the appellant, Richard Dorsett. Administrator of the estate of Carol Dorsett. This is the case wherein the trial court granted summary judgment to a doctor, defendant Dr. Arwari. The question there and the question here is whether something in the record shows that Dr. Arwari contributed to the use of Coumadin on the patient after he was transferred from the hospital to the Newman nursing home. I don't think there's any dispute about the causal connection there. I mean, even Dr. Arwari admitted that the Coumadin caused the stroke. It was because Coumadin is an inappropriate medication when you've had a hemorrhagic stroke, which is what he had the first time and it could cause more bleeding. The question all came down to the testimony of the deposition of Dr. Nurse Nance, the nurse at the hospital who created the record. The record that went, that was faxed to Newman. That's the record that everybody agrees. I'm not talking about, first there was an initial batch of information, then there was the fax that went to Newman, the preliminary fax, and then there were the final records that somehow ended up at Newman at a later date. I'm talking about the initial, the middle section of that. The orders that were faxed to Newman, two-page order that morning, and in the order, that order caused Newman to in fact continue the use of Coumadin, which led to the stroke. It was not clear to me why the trial court judge granted his summary judgment in favor of Arwari because the record shows that he granted the motion because there was no indication that Dr. Arwari sent any documents to Newman. That's not what the allegation was. Nobody said that Arwari is responsible for carrying that document to Newman. The way it came up, of course, was that Nurse Nance was the one responsible for preparing that document. Nurse Nance put in the document what was transmitted over. The defense contention was that when you look at Nurse Nance's testimony, Nurse Nance said that when that order contained the phrase TORV, telephone order readback, that wasn't necessarily what the order meant. Apparently they put TORV on all the orders, which itself seems rather odd. But the point here was that Nurse Nance did not entirely disavow that full order. She didn't say I made that whole order up. The critical testimony in the case, and my opposing counsel, I know what it is. It's page A1. She said basically that TORV is a standard that we use when we're doing these discharge orders because we've already talked to the doctor about the discharge. In other words, when that order is sent by Nurse Nance to Newman, she said she has in fact talked to the doctor. That's her reason for sending that order to Newman. I thought the form populated automatically based on the medications when he was admitted. It does, but the witnesses agreed. It was also in fact an instruction to Newman to continue the Coumadin. Dr. Arwari agreed that, Dr. Sochomchak, Dr. Miller's expert all agreed that that was in fact why I sent that order. I understand that the order itself doesn't seem that clear to me, but the medical people said that's what it accomplished. Although it was populated by a computer, it was nonetheless the result, at least according to Nurse Nance, of her saying I've already talked to the doctor about the discharge. Nobody asked her what did you do when you talked to that doctor? If we had that further, if I was there or probably if my opposing counsel was there and we could have asked two or three more questions, we could answer that for you, but we can't. But our position is quite simple. She said she talked to the doctor about the discharge. That order is part of the discharge. That order is what they relied upon. But didn't Dr. Arwari issue a different order that went to Newman that did not have the Coumadin on it? That's correct. The final order is the ones that were transferred... That doesn't disavow or disprove what Nance said. The jury would still hear Nurse Nance say, yes, I talked to Dr. Arwari and then I sent this order that contained the fax order that contained the reference to the Coumadin, but their testimony I think was meant to be, well, it didn't really matter because there were some final orders that went over and if somebody had read those final orders from Dr. Arwari, they would have realized the Coumadin was not to be taken. The problem with that is that according to Nurse Northway and according to the records, that final batch did not go with this patient. At least there's a question of fact about that because the timing show that Nurse Nance and Nurse Norway both talked about the timing of the preparation of that final order and both weren't prepared until after the patient was transferred, so they couldn't have gotten to it. Now, one of the witnesses said the only way that they knew that that final order, that last package had gotten there was because when they got Newman Foundation's records, it was there. But nobody knows when it got there, but we know it didn't go with the patient, which means that when it went there, the nurses at Newman had only that discharge order that told them, as they read it, that Coumadin was okay. In fact, Dr. Suchomsky said Dr. Miller had no reason to question that. It came in, it looked okay, those nurses want those records there in advance so they can get the medication moving right away. If the final orders came in at some later date and somebody should have caught that at a later date, that would be, I think, another question, not one that's part of this appeal. That's going to be part of the argument of the trial. I had a couple procedural questions. Was Carl Hospital ever sued as the employer of Nurse Nance? No. And then there was another one I wanted to ask you about. Is the case still pending against Newman? Yes, it is still pending against Newman and Miller. I believe those are the last two. And then Awari said he was never called by Nance with regard to this transfer-discharge order and she did not have any independent recollection of talking to him, did she? That's correct. He denies talking to her, she doesn't know it. I have a question about that. Nance said there were no discharge orders given at the time that the transfer order, which I think is what you're referring to, was sent over, is that right? That's correct. And so as Justice Polk indicated, it was just a function of the computer pre-populating what was sent over and not necessarily a conversation with the doctor, correct? No, I would disagree with that because when they're talking about that very document, that's when Nurse Nance, and it's in her appendix at A1, she said that when we do these discharge orders, and she's now talking clearly at that point about the faxed order that has the coumadin in it, she said we're doing those orders, whether they're populated by the computer or by her, because we've already talked to the doctor about the discharge. The implication there is that Dr. Awari at that point is approving that order, whether it's prepared by Nance, prepared by the computer, or whatever. It's still a human-prepared document. What does it mean when there was no discharge order at the time that the draft transfer order was sent? Maybe I misunderstood. Dr. Awari's position was that that was simply a draft order. Nurse Nance was adamant about that, if you recall. She said that was not a draft. We have to do that. We send that over to the Newman Nursing Home because they want that information. When that patient comes through the door, they want that so that they can get the meds in advance. So it wasn't a draft order. It wasn't just something that was sitting on somebody's desk. It was sent by Nance to the home, apparently according to her, with Awari's approval, because that's what the phone call with Awari would have been about, would have been the discharge, and sent with the intent that they rely upon it. Now it might have been undone by something later on, but I submit that's what the nursing home should have done if they got some different order at a later date. That's a different question than I think we have here. That's beyond the scope of this interview. Of course, Awari had the discussion with the family, and they agreed unanimously not to continue the Coumadin. So it seems to me like that plays against the fact that she would have talked to him in order to prepare that transfer order. I have to agree. Just what I just read, she said, when we're doing these discharge orders, and that's this order, when we're doing them, I think a jury can read that to me, when we are preparing these discharge orders, we talk to the doctor. Well, if that discharge order, and that's what she's talking about, it's just what Your Honor is talking about, has Coumadin in it. But she admitted that sometimes she puts TORV on there even when she hasn't spoken with the doctor. I didn't quite say that, Your Honor. We use TORV routinely, and her answer could be read one of two ways. One, we put TORV down there all by ourselves. Whatever we want, we put on that transfer order. Or it could mean TORV simply means did not read back. I don't have to read it back to him because I already talked to him. That's what she's saying in her answer on that page. She said we're doing these orders because we've already talked to the order about the discharge. That's the telephone order part. The read back is what they apparently put down routinely because if the suggestion Your Honor is making and the defense counsel is making correct, nurses are simply putting TORV meaning that would mean I didn't talk to the doctor. I have no telephone order. I don't have an order. I'm just transferring these documents all by myself. That seems absurd. So she didn't say that sometimes she puts TORV on there without actually calling the doctor? She didn't say that? No, I don't believe that's how I read her testimony. I don't believe she says I write that in when I haven't talked to the doctor about the discharge order. My question is does she say that she writes that in sometimes without actually calling? You changed it a little bit and say that I didn't call. I'd have to go read her exact words. But the way I read those words was that she doesn't write those things in. She doesn't write TORV when she's had no contact with the doctor. Whether it's a telephone call or in the office before he left the hospital here would seem to be a telephone call. If it means she talked to him here, it would seemingly have to be a telephone call. So as to this instance, she's looking at the document and she says that means we've already talked to the doctor. If she's already talked to the doctor and it's about the discharge, I am arguing that the jury can assume from that that they talked about what's supposed to be in the discharge order. Because if they're talking about the discharge order, the doctor surely didn't say just write some things in a discharge order and send it over. It's his responsibility. I think it was Nurse Northway who said it is his responsibility to make sure that the proper information about the medications is in that order. Now whether he did or not, that's on him. But once you realize that there's testimony that the doctor has got a role to play at the time of transfer, I think the jury can draw the conclusion that if he talked to the nurse right before the transfer, either personally or by the phone, he must have said something about that. Otherwise, we're back to what I said before. It's a renegade nurse, a nurse just prescribing meds. Or same thing, taking something off a computer and passing it on, which strangely enough, but that's the record here, that the people at the nursing home rely upon and that everybody knows they're going to rely upon. Once you do something like that, that standard of care means that you've got to watch what you're doing. It seems to me like there might be a good cause of action against her employer, but nobody sued them. That's correct. But if there's... Again, it depends who you believe. If you believe her that she talked to the doctor, then her employer doesn't have anything to do with it. She testified she never showed the draft transfer order to her worry. It was standard practice to sign the doctor's name on the draft transfer order. She did not recall if she actually spoke with her worry about the document. I agree with that. I know that's right there. But I always go back to what she said. It's also a standard that when they do that, we've already talked to the doctor. So from that, unless she was lying when she gave just that one answer, she talked to the doctor. She talked to the doctor about the discharge order. I don't understand why that would not be enough. That means the hospital didn't do anything wrong, because nurses would say, well, I don't remember, not surprisingly, I don't remember that I talked to him, but I've got this order. I may not have read it back to him, but I did talk to him about it. That hospital's not responsible then. Then it's going to be on Dr. Arwari, because he's the one that's responsible for what's in that order. The very fact that Arwari's responsible for what's in that order would surely raise an implication  that he would not have abdicated his responsibilities entirely. The testimony doesn't show he was a bad doctor. It doesn't show she was a bad nurse. If not for the nurse getting the information from the doctor to approve that order, I think then the court would have to say that a nurse at the hospital is taking something that came into the hospital and passing it on to somebody, knowing they're going to rely upon that without talking to anybody, and putting it upon herself to do that. I suppose that's an argument they can make to the jury, but I don't think a jury's going to believe this nurse, who seems pretty careful otherwise, was a renegade nurse. Somebody had to approve that process. It wasn't done at random. It's either Arwari or Nance or both. Nance said, we're both part of the process. Arwari said, I never talked to her. But that means nobody put it in there. She just did it by herself. How could that be? I don't think a jury's ever going to buy that. That's the issue. I could repeat that numerous times, but that's not going to advance my cause, and I'm aware of that. Unless you have some further questions. Your whole point is, there is a disputed issue? That's all. I've never seen a dispute of facts come down to basically one little tiny paragraph in a deposition. If I had enough nerve, I could have filed this brief in two pages, but I don't have that much nerve. Nor would my client. Unless there are further questions, we obviously ask for a reversal. Thank you. Thank you, Your Honor. May it please the Court, Counsel. Counsel, Mr. Ratzak has laid out fairly the dispute in this case. The question is whether the testimony of Nurse Nance specifically is sufficient to create a genuine issue of material facts that would justify a reversal. Based upon her testimony, it's clear that she considers it likely that she spoke with Dr. Arwari at some time in the process of preparing the document that was faxed at 1032. She explicitly denied the idea that he had necessarily been consulted and approved of its contents based upon the inclusion of the acronym TORB. She said, when asked, so that means that Dr. Arwari was informed of the information that's on Exhibit 1 and he agreed. She said, no, I don't agree with that. She continued to explain that the phrase is something that she simply writes on the paper and that it means that she's spoken with him, but not necessarily that she's cleared the details. Dr. Arwari and Nurse Nance both gave similar accounts of where the word coumadin appeared on that order, how it came to appear on that document. It came to appear on that document because Carl's systems automatically populate the medications from the time of admission on the discharge medications up until the point that a final discharge order is entered. That's in the testimony of both Nurse Nance and Dr. Arwari. They're consistent in that regard. They do disagree in that he says that he never spoke with her and that she said that she believes she did speak with him in preparing the order, in preparing the document. But the fact is that that's not a material dispute between the two points. Now, Nurse Nance would have had to testify that Dr. Arwari actually had instructed her to place coumadin on that order or at least that she had read the information on that back to him and he had confirmed its contents. The facts of the case have to show... What if he said, they talked about it and he said we're going to have to re-evaluate the coumadin? He might well have said that because he actually gave the option to the family. Your Honor, he did give that option to the family. It's sort of 50-50. Yes, it's a risk, but yes, you've got the heart valve. The mitral valve replacement valve, yes. So 50-50, what do you want to do? Do this. Aside from this particular document, his treatment of the patient was consistent from May 29th up until discharge. He agreed with Dr. Rack to discontinue coumadin after the patient came in. On the 2nd, they discussed whether or not to continue coumadin with the family. On the 3rd, after the decision to discontinue had been made, on page 4 of the referral packet to Newman Rehab, it explicitly stated that coumadin had been discontinued by the orders of Dr. Rack and Dr. Arwari. That was the first document. It seems very risky to me that the hospital sends a transfer discharge order that includes all of the medications at the time of admission, rather than the medications that are currently prescribed for the patient. Has there been a change to the procedure that's been used? Your Honor, I don't know the answer to that question. I apologize. My response to that would be that Carroll Foundation Hospital is not a defendant in this case. I know all that. So Carroll Hospital, for whatever reason, wasn't sued. Nevertheless, our goal should be to prevent something like this from happening in the future. Certainly. Now you represent Dr. Arwari. Yes, Your Honor. It seems to me that somebody ought to be taking the message back somewhere to make sure that this procedure is correct. That's certainly the case, Your Honor. I know that as a consequence of our representation of the defendants in the underlying lawsuit, that we would have reported on this deposition and its significance to Carroll's risk management officer. I cannot represent to you with knowledge that the procedure has been corrected, but I can certainly write to ensure that they understand the risk if they have not already appreciated it based upon the deposition testimony. I think that would be a good idea. Certainly, Your Honor. With that said, with regards to the legal questions before the Court today, it is concerning, but irrelevant, because the entity responsible for the creation of that document, Carroll Foundation Hospital, is not party to the suit. Now, there is a second piece of testimony that answers a question asked by Mr. Rathsack in his argument, which is, what is the purpose of this document that Joanne and Nance sent to Newman Rehab at 10.32 a.m. on June 4th? And she described it as, usually it is sent because the nursing homes, a lot of them have their own pharmacies, so they're very, very anxious to get a summary of what possible medications this person might be on so that they can make sure they have everything available. And they also want to know ahead of time, okay, is this person going to be on isolation? What's their code status? That's why we try to get to this as fast as possible. That's at page 32 of her deposition. She's explaining that this is not intended to be a discharge order, providing the comprehensive explanation for what the patient is going to need when they arrive at the rehab. It's to put their pharmacy and their staff on notice of what the needs of the patient are going to be when they're received. She also testified that typically the final discharge order will be sent with the patient to the nursing home. And Dr. Arwari did complete the final discharge order before Mr. Dorsett was discharged from Carl. It's an issue that the appellant has raised that it was apparently not printed by Nurse Nance until after Dr. Arwari left the hospital. We don't know exactly how that record got there, but we do know that it was generated by Dr. Arwari before the ambulance left. And we know that it was ultimately received at Newman at some point following the transfer. Again, this comes to a question of whether there is testimony that Dr. Arwari's timing on the issuance of his final discharge orders was negligent. And there's simply none to that effect from any of the expert witnesses. Now, we've established already that the document was automatically populated with Coumadin, so it's not a mystery and it's not a rogue nurse. She is signing a document because it has a signature of mine, and she testifies that she had talked with the doctor ahead of time, but explicitly denies that the presence of the phrase TORB necessarily means that he approved of its contents. He denies it. He denies having been consulted or having approved of it. In fact, it's completely inconsistent. I don't think that a jury could possibly credit the claim that at 10 o'clock he affirms an order prescribing Coumadin, and then at 11.02 he issues a final discharge order that has removed Coumadin. His entire care, with the exception of this 10.32 fax, was consistent in removing Coumadin. He didn't receive it at the hospital. It was reflected in the records that were sent on June 3rd. And we have this one outlier, which no one can testify he was actually consulted. We have testimony from three expert witnesses who address the presence of the phrase TORB in that document. The first is Nurse Northway, who is an expert witness on behalf of Newman Rehab. She testified in the context of explaining how the Newman Rehab staff's inferences were reasonable, that they had an order from Dr. Arwari. She was not testifying that TORB has some kind of independent significance in the medical profession as meaning that the doctor must have been informed of all the contents of the document and have approved them for that phrase to have been written. She looked at the document and said, well, Dr. Arwari issued an order including Coumadin, so Newman Rehab was reasonable to rely upon that. It's similar testimony from Dr. Norm and Dr. Sikomsky. And ultimately, the expert witnesses are in agreement that if Dr. Arwari did not approve of the inclusion of Coumadin on that order and did not order it, that he is not liable, that he complied with the standard of care. But all of that relates to the level of communication between the nurse and the doctor. Yes, Your Honor. You're certain about that? You're certain that that communication has been revealed? To the best extent possible in discovery. I don't see how there could have been any other information about the communication between the doctor and the nurse. If, for instance, we were to obtain the phone records from the hospital to determine if a phone call had been placed between Dr. Arwari and Nurse Nance, even that would not provide a basis for a jury to render a verdict against the defense. So it would not be a genuine issue of material fact, because it's really the content of that conversation that's important. Dr. Arwari has to have said either make sure he's on Coumadin, put him on Coumadin, or he needs to have been told by Nurse Nance, this has listed Coumadin as a discharge medication, is that acceptable? And he would have to assent to that. If he did not agree to the inclusion of Coumadin on that record, then there can't be any liability against him. Now, what if he agreed to send the information without the information being fully communicated to him? And there's a difference between it being read back and communicated. Communicated can mean a brief summary. Communicated can mean what's on here, you know, this is the standard, this is the routine when it's got the stuff that he was on when he came into the hospital. Read back means reading back the words that are on the page. Discuss, talking about it means talking about it, which could have included the phrase, we've got to recheck that Coumadin, or we have to correct that in the final order, or I'll have to remember to follow through on that.  I would say they might have to decide, infer one way or the other, but I guess that's speculation. One word used by you and one word used by me. That's certainly the position that I take, Your Honor. Counsel, if there was some communication, some conversation between the doctor and the nurse, was there an obligation on the part of the doctor knowing that, okay, this is going over to the nursing home to say, okay, make sure Coumadin's not on there because he's off that? I don't believe so, Your Honor, because he is responsible for the discharge of the patient from the hospital. He knows that the patient cannot be discharged without him making that final discharge order. So he is in the position to present the final say on this patient, which is reflected in the order that he completed at 11 o'clock and does not include Coumadin as a medication. If he has that conversation, I really don't see how the jury can infer what might have been said in that conversation without speculation, because, again, Nurse Nance says TORB does not necessarily mean that he agreed with the contents of the order, and Dr. Arwari says I did not agree with the contents of his order, I wasn't consulted. So, again, the jury needs to have a hook to hang its hat on somewhere. It needs to be able to have a piece of evidence that it can look at to say, in this case, that Dr. Arwari may have ordered Coumadin. But Nurse Nance can't provide that, neither can Dr. Arwari. The expert witnesses can't provide it, because they testified only that Newman Rehabs was relying on their inference that Dr. Arwari had issued an order, and none of the other witnesses have anything to say on the topic. So Nurse Nance basically saying that, generally, this on the form means that I spoke with him. I mean, I understand not necessarily going over verbatim the contents of it, but her just saying I spoke to him about it, that's not enough for the jury to say, well, if they talked about it in any way, shape, or form, the doctor had a responsibility to make sure that Coumadin was not on there, given that it was going to the nursing home. No, Your Honor, I don't think that the jury would be able to make that leap from they spoke to Dr. Arwari said this, without engaging in Well, I'm talking about what he didn't say, is what I'm saying. The fact that he didn't say make sure Coumadin is not on there. Your Honor, I guess the response to that has to be that there's no expert testimony that it's within his standard of care to direct Nurse Nance what to put on this document that she faxed over. And she testified that that was required under the hospital standard of care. So that doesn't apply to him. He's not responsible for this document having to have been sent. But the question isn't whether the jury could make the leap. The question is should the jury be given the opportunity to make what they would then believe would not be a leap, but would be some logical inference. Your Honor, We're really talking about the quality of the degree of contradiction between, because the nurse says I talked to him. He said I wasn't consulted at all. Yes, I understand that there's So, if a jury, a fact finder would believe the nurse, then at least you've got this question in your mind about what they talked about. What else would they talk about? A lot of things probably, but maybe that would be at the top of the list. It's hard for me to respond to that, Your Honor, without engaging in more maybes. And that's not my position as the appellate. But the difficulty is that again, they can decide to believe nurse Nance that a conversation took place. That doesn't prove the plaintiff's case. But isn't that an argument? I don't disagree with you about maybe Mr. Rastak wouldn't like this, It's thin, but the question is not whether he would prove his case. The question is should the jury be able to consider it, because it seems as if there is a degree of contradiction or conflict there. Because then you'd be arguing about is it reasonable to make the inference from once it's presented to the fact finder. Certainly. Your Honor, if we were only able to grant summary judgment in cases where there's absolutely no contradiction as to facts, we would have a... All trial judges know that's when you most likely get reversed when you grant summary judgment. At least that's what we talk about at conferences. That's true, Your Honor. We would have an even more congested docket. This is a case where you have no evidence to support the idea that he made an order or that he approved of it. You have the barest, the thinnest of margins to infer that potentially he might have, but even construing all the facts in the light most favorable to the appellant, what we have is there was a conversation between Dr. Arwari and Nurse Nance before discharge, and we don't know what was said. Maybe it was about the Coumadin. Maybe it wasn't. Even if they make that inference, then they're faced with the fact that an hour after she printed the preliminary discharge summary, he issued a final summary that removed Coumadin, that was consistent with all the rest of his care over the course of the hospitalization. Now, all of this comes back to the fact that Nurse Nance used the phrase TURB, but she cannot recall what the nature of her telephone order, if any, or the nature of her readback, if any, what those were. And she testified that it's not her practice to use that phrase to signify that there's been any kind of approval. So I really struggle to see how a jury could make that inference permissibly. Like Mr. Ratzak, I could repeat the same argument for the next five minutes, but I really think that this is a very simple case. There's two or three pages of Nurse Nance's deposition that really have to decide for the court what the decision will be. And I hope that I've been helpful in presenting on behalf of my client. If you have no further questions, I have concluded. Thank you. You always get points for leaving minutes on the board. And I will try not to lose whatever points I might have gotten by getting over them long at this point. I really just want to address part of the transcript that counsel referred to, and I was asked, so that means Dr. Arwari was informed of the information on this form, and she says, no, I don't agree with that. That's what counsel told you. But the rest of that paragraph says, how do I explain this? She concludes with, so no, he didn't look at this document and say, I agree with it. So somebody looking at this, probably a jury down the road, is going to read this and say, all that Nurse Nance was saying in her testimony was that in this case, he did see the document, and potentially, I didn't even read it back to him. But she never backed away from the statement that I spoke with him before it was entered, and that should be considered in light of the fact that she testified just a couple of pages later, whose role is it to communicate medication information from one institution to another, and she says the doctor. So if the doctor, and that's Arwari, if it's his responsibility to ensure communication of the cumulative information from here to here, and the nurse says, I talked to him before I wrote the discharge order, even if he didn't see it, and I didn't read it back, that is our case going to the jury. And to paraphrase Justice Connick, I understand that we don't have a very, very strong case. We have a case that may have some difficulty with it, but we still have a right to take that case to the jury. Unless the court has other questions, that would surely be good. Thank you. We will take this case under advisement and recess for lunch.